Rhasaan ALSTON, Appellant,

v.

UNITED STATES, Appellee.

No. 02–CO–1370.

District of Columbia Court of Appeals.

Submitted Oct. 9, 2003.

Decided Dec. 24, 2003.

Thomas T. Heslep, Alexandria, VA, appointed by the court, and Cynthia Nordone, were on the brief, for appellant.

Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Barbara J. Valliere, and John P. Gidez, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and GLICKMAN, Associate Judges, and PRYOR, Senior Judge.

PRYOR, Senior Judge:

At the conclusion of a jury trial, appellant and two co-defendants were convicted of offenses stemming from the killing of

one person and assault upon another.[1] Although there is a direct appeal from those convictions now pending before this court, appellant, in the present appeal, challenges the denial of collateral relief, D.C.Code § 23–110 (1981), by the trial judge. He asserts that he was denied his constitutional entitlement to effective assistance of counsel because his trial counsel was acquainted with a prosecution witness, thereby impairing her representation of him. Being unpersuaded by this contention, we affirm.

## I.

In June 1994 appellant, Donnell Porter, and Norvelle Nelson arranged to meet Mamodou Mbaye and Modibo Hylton at the Kennedy Playground in Northwest, Washington in order to purchase marijuana. Upon arriving, appellant approached the two men alone and asked about the marijuana before leaving to get Nelson and Porter. When the three men returned, they each drew a gun and began searching Mbaye, taking his marijuana, and Hylton, taking his pager. Appellant ordered the two men onto the ground; before they could lay down, Nelson hit Mbaye with his gun, knocking him to the ground and then sat on him. Hylton had put his hands in the air, heard a gunshot and looked up to see appellant pointing a gun at him. When he stepped to his side he was met by Porter, whose weapon was pointed at his head. Appellant then fired his weapon, grazing Hylton's face. Hylton took cover under a nearby picnic bench, where he was shot again—this time by Porter—the bullet entering his left shoulder. Hylton, attempting to get out from

under the picnic table, saw Mbaye on the ground, not moving and apparently shot in the head. He attempted to move Mbaye, but experiencing a great deal of pain in his shoulder, lay down on the ground, and passed out of consciousness. The attack resulted in the death of Mbaye and serious injury of Hylton. Appellant, Porter, and Nelson fled the scene on foot but were later identified by Hylton and arrested.

During the course of the trial, appellant's counsel made the court aware of a relationship she shared with a potential government witness. The witness was Patrick Hylton, father of Modibo Hylton, the complaining witness. Counsel stated that she knew the father as a result of belonging to some of the same organizations and attendance at activities related to the groups. Upon learning of the circumstances, the trial judge conducted an inquiry of counsel, including the following:

THE COURT: Are you fully prepared to cross-examine the witness on the witness stand?

[COUNSEL]: Yes, I am, I'm fully prepared to cross-examine any witness that the government presents.

THE COURT: Including the son of somebody you've met socially?

[COUNSEL]: Yes, Your Honor, but I want to put this on the record for the record and in the presence of my client.

THE COURT: Do you have reason to believe that you have a conflict of interest between fully and zealously advocating on behalf of your client and whatever social contact you had with [t]his witness's father?

1. The convictions were for violations of D.C.Code §§ 22–2901, –3203 (1981) (armed robbery of Mbaye and Hylton); §§ 22–2401, –3202 (1981) (first-degree murder, premeditated while armed of Mbaye); §§ 22–2401, –3202 (1981) ( first-degree murder, felony murder while armed); §§ 22–501, –3202 (1981) (assault with intent to kill while armed of Hylton); § 22–3204(b) (1981) (possession of a firearm during a crime of violence); § 22–3204(a) (1981) (carrying a pistol without a license).

[COUNSEL]: No, Your Honor, my first and foremost commitment is to my client, and I'm fully prepared.

THE COURT: Is there anything -

[COUNSEL]: Even if that—if that ruptures that relationship, then that's the way it would have to go. But my oath is to my client, I'm just making the court aware of the situation.

THE COURT: I appreciate that you're doing that. But unless you said to me I have some allegiance or obligations to the father of this witness or to the witness, or I've once represented or had some kind of professional responsibility toward the witness or the witness's father, or some other circumstance that would raise a legal conflict, I don't see one such that I would ask your client if he's willing to waive it.

[COUNSEL]: Okay.

THE COURT: But let me -

[COUNSEL]: I have no allegiance to Mr. Hylton Sr., none to the current witness on the stand, Mr. Modibo Hylton.

THE COURT: Okay.

[COUNSEL]: I'm prepared to zealously cross-examine both father and son.

Additionally the court questioned the appellant directly asking:

THE COURT: Do you have concerns about the representations that your lawyer has made about knowing Mr. Hylton, Sr., and being in some of the same associations with him?

[APPELLANT]: Yes.

THE COURT: What are your concerns sir?

[APPELLANT]: I don't know, I mean, what kind of a dinner they had?

THE COURT: Oh, you want to know if it was social?

[APPELLANT]: Were they working on a case or something?

THE COURT: Was it what?

[APPELLANT]: Were they working on cases, you know.

THE COURT: Okay. Your client would like you to tell him, you don't have to tell me, just how social was your relationship with Mr. Hylton, Sr.

. . . .

[COUNSEL]: No, we have not worked on any cases together. The relationship has been purely social, belonging to the same organizations, going to picnics in the park, voting on issues on the particular—this organization that we belong to, strictly family-oriented, personal issues, nothing professional. We have not collaborated on any cases whatsoever. In fact, I think he specializes in family division cases and neglect cases, I do not, I do not handle those types of cases.

Finally, the judge informed the appellant that although she saw no legal conflict of interest she would permit him to discuss the matter privately with his counsel over the lunch hour. In the meantime the court heard the cross-examination of Mr. Modibo Hylton and further inquired of appellant after the cross-examination and his opportunity to talk to his counsel.

THE COURT: [To appellant] have you had a chance to think about the issue that came up with your lawyer knowing or having had some contact with this last witness's dad and are you satisfied that she has been able to put that out of her mind and adequately cross-examine the witness on your behalf?

[APPELLANT]: Yes.

THE COURT: Do you have any questions that you want to ask her that she—that you haven't had a chance to ask her?

[APPELLANT]: No.

THE COURT: Are you otherwise fully satisfied?

[APPELLANT]: Yes.

The jury, upon concluding its deliberations, returned guilty verdicts against appellant.

## II.

Appellant contends that the trial court erred in denying his motion for a new trial without first conducting an evidentiary hearing, beyond the questioning reflected in the trial record, to determine whether an actual conflict of interest resulted from defense counsel's relationship with a government witness. He further contends that, assuming an actual conflict existed, trial counsel's omissions during her cross-examination of Patrick Hylton adversely affected her representation of him.

■■■ Our review of the trial court's determination of whether a conflict of interest exists is "a deferential one," presenting a mixed question of law and fact. *Derrington v. United States,* 681 A.2d 1125, 1132 (D.C.1996) (quoting *Bowman v. United States,* 652 A.2d 64, 73 (D.C.1994); *Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992)). We will accept the trial judge's factual determinations, unless unsupported by the evidence, but we review her legal conclusions de novo. *Derrington,* 681 A.2d at 1132. Additionally, we review the trial judge's denial, without a hearing, of appellant's motion pursuant to D.C.Code § 23–110, for abuse of discretion. *Minor v. United States,* 647 A.2d 770, 776 (D.C.1994).

■■■ The Sixth Amendment establishes a constitutional right to counsel, which encompasses a "correlative right to representation that is free from conflicts of interest." *Singley v. United States,* 548 A.2d 780, 783 (D.C.1988) (quoting *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981)). To succeed on a challenge of the effectiveness of trial counsel on the basis of a conflict of interest, the

appellant must show that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). This is a more lenient standard than that set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires the appellant to establish both deficient performance and prejudice, however, as the Supreme Court set forth in *Cuyler* "unconstitutional multiple representation is never harmless error. . . . Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler,* 446 U.S. at 349–50, 100 S.Ct. 1708. The appellant must, however, "point to specific instances in the record to suggest an actual conflict or impairment of [his or her] interest." *Derrington,* 681 A.2d at 1133 (quoting *Fitzgerald v. United States,* 530 A.2d 1129, 1133 (D.C.1987)).

## III.

■■ We begin our analysis within the context of the *Cuyler* test, which places the burden on the appellant to show an actual conflict of interest which adversely affected the performance of his or her attorney. *Cuyler,* 446 U.S. at 348, 100 S.Ct. 1708. The trial judge, in her memorandum and order denying the appellant's motion for a new trial, found that "the defendant [had] failed to demonstrate that his attorney had an actual conflict of interest arising from a social relationship with the father of the complaining witness," and that "the attorney was at all times a 'single hearted zealous advocate' for defendant Alston."

In addressing the pivotal concerns of the *Cuyler* test, whether an actual conflict of interest existed, the record reveals that the trial judge questioned counsel and appellant extensively. Counsel provided unwavering responses reflecting her duty

and willingness to zealously represent her client. The court permitted appellant to question his attorney, observe cross-examination of the complaining witness, discuss the matter privately with counsel, and express any continuing concerns to the court. Ultimately, the trial judge found that trial counsel's relationship with the witness was "[nothing] other than platonic." Appellant rightly argues that he is entitled to counsel who is free of conflicting interests. In this instance, however, the judge found no legal, personal, or other latent obligation between trial counsel and the witness which would present a conflict of different interests. The judge noted that the evidence did not indicate, and appellant did not argue, that the relationship was either intimate or long-standing. The judge was in the unique position of being able to participate in this dialogue with both trial counsel and appellant about any potential conflict, and was able to evaluate the credibility of the responses provided. Finding the trial judge's questioning thorough, and her conclusion supported by the record, we also conclude that appellant has failed to meet his burden of showing an actual conflict of interest.

Even assuming a conflict of interest, we note that the trial judge addressed contentions of deficient performance by his counsel in her order denying relief. The judge found that "[trial counsel] advanced all defenses available to her client, had undivided respect for her duty of loyalty to her client, and did not appear to be in any way conflicted in her responsibilities to her client." Upon review of the record, specifically the cross-examinations of Modibo and Patrick Hylton, trial counsel covered a myriad of issues in an attempt to further the defense theory of the case. Cross-examination of Modibo Hylton covered his prior drug sales activity, his ability to identify the shooter or shooters, whether he had told his parents that he was at the playground for the purpose of selling drugs, and whether his parents were present during the initial photographic array. Cross-examination of Patrick Hylton, as argued by the appellant, was in fact brief. However, cross-examination of Patrick Hylton by counsel for the co-defendants was equally brief, and all three lines of questioning focused on the central issue of what Patrick Hylton observed during the presentation of the photographic array to his son.

We are satisfied that the trial court performed its duty, upon learning of a possible conflict of interest, to inquire as to counsel's effectiveness. *Wood v. Georgia,* 450 U.S. 261, 273–74, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). We are equally satisfied that the trial court's determinations that no actual conflict existed and that counsel's performance was not deficient are supported by the record. Having found such support in the record, we conclude that the trial judge's denial of appellant's motion for a new trial, without a hearing, was without error.

*Affirmed.*